### COLONNA'S SHIPYARD, Inc. et al. v. O'HEARNE.

#### No. 6499.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 17, 1952.

Decided Dec. 9, 1952.

---

5.   5 U.S.C.A. § 1009.

Lester S. Parsons, Norfolk, Va. (Venable, Parsons, Kyle & Parsons, Norfolk, Va., on the brief), for appellants.

Herbert P. Miller, Atty., U. S. Department of Labor, Employees' Compensation Division, Washington, D. C. (A. Carter Whitehead, U. S. Atty., Richmond, Va., Charles R. Dalton, Jr., Asst. U. S. Atty., Norfolk, Va., William S. Tyson, Sol. of Labor, and Ward E. Boote, Asst. Sol., U. S. Department of Labor, Washington, D. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a judgment of the District Court which sustained an award of compensation to Jones E. Spencer under the Longshoremen's & Harbor Workers' Compensation Act, 33 U.S. C.A. § 901 et seq. The question for decision is whether the award of the Deputy Commissioner was supported by substantial evidence.

Spencer was 63 years of age. On October 31, 1951 he was employed by Colonna's Shipyard, Inc., as a carpenter and was engaged in repair work in the engine room of the M/V Joseph H. Davis then afloat on the Elizabeth River in the State of Virginia. He testified at the Commissioner's hearing that at 2:30 P.M., as he got down to place a wedge under the back end of the engine where some grease and oil had been spilled, his foot slipped and he wrenched his left ankle "a little bit"; but caught himself on the other foot and did not fall. He felt pain at the time but did not twist or strain or injure his knee. He did not sit down but kept on working until night as he was able to hobble around.

When he got home there was a little swelling but no discoloration and he soaked the knee in epsom-salts water. He reported to work the next day but did not work. He saw Dr. E. Ray Altizer the following day and acting upon his advice continued to soak the ankle in hot salt water for three days and then the doctor bandaged the ankle with an ace bandage. During this period the leg started swelling and then, in accordance with instructions, he consulted Dr. Eugene Leslie Lowenberg who performed an operation, but there was no relief. The swelling continued and the pain was very great. He remained in the hospital ten days and then went home for three days and there noticed that the bottom of his foot had turned dark. He returned to the hospital and two days later, on December 7, 1951, the leg was amputated above the knee.

Dr. Altizer, an experienced surgeon in Norfolk for thirty years, saw the injured man on November 2nd. The ankle was painful but there was very little swelling and no discoloration. The ankle was bandaged and the man was sent home. Five days later he returned suffering much pain. At that time the leg was blanched and there were definite indications of gangrene from an arterial blockage. On November 7th the case was referred to Dr. Lowenberg, an arteriovenous specialist of twenty-five years' experience, whose practice is largely

directed to vascular disease. Upon examination Dr. Lowenberg found no evidence of sprain but he observed that the leg from midway of the knee and ankle was pale and cold with the veins collapsed. Oscillometric readings indicated a definite obstruction of the artery at the knee level. The impression and findings of the doctor dictated at the time are set out in the following statement:

" 'Impression: Sudden onset of pain along the mesial aspect of foot and lower leg immediately after turning the foot' (that is, spraining the foot) 'is highly suggestive of acute traumatic arteritis. At present the findings are those of acute thrombosis of the popliteal artery, the presumption being that the thrombotic process has spread upward from the posterior tibial artery to the knee level'—that is, to the popliteal artery."

The patient was given anti-coagulant therapy and on November 7th was subjected to a lumbar sympathectomy, an operation on the nerves in the paravertebral region, in order to dilate the collateral blood vessels of the leg in the hope that the obstruction in the artery would be removed. Some days later the patient went home and some improvement was noticed but after two weeks the swelling and acute pain persisted and the leg presented a cadaverous appearance so that an amputation above the knee on December 7th had to be performed.

The Deputy Commissioner inserted the hospital report of Dr. Lowenberg for the most part in totidem verbis in his findings of fact, and adopted the physician's first impression as the basis for the conclusion "that the cause of amputation of the left leg above the knee was due to a thrombus which was caused by and flowed from the injury the claimant sustained on October 31, 1951 in the course of his employment."

In reaching this conclusion the Deputy Commissioner omitted all mention of other testimony given by Dr. Lowenberg at the same hearing to the effect that after his first examination of the injured limb he received well authenticated additional information which led him to conclude that his first impression was incorrect and that the arterial obstruction in the leg was probably caused by an embolus from the heart. He explained that his first impression was influenced by the report of the sprain and by the well known fact that even a relatively small trauma may lead to the local formation of a thrombus in the limb of an aged man; and he added that the course of the obstruction was immaterial at the time of his first examination since the existence of the thrombosis from whatever source justified the operation. He further testified that he subsequently learned that the patient had been suffering from auricular fibrillation of the heart for some months prior to November 7th, and that a pathological examination of the amputated leg disclosed a clot in the popliteal artery at the knee, and that these facts, coupled with the absence of any indication of a sprained ankle, caused him to alter his original diagnosis.

It was shown by the medical testimony that auricular fibrillation not infrequently causes emboli or clots to form on the walls of the chamber of the heart which may move through the arterial system to the brain and cause cerebral thrombosis; or, on the other hand, may move to the other extremity of the body and there give rise to an arterial obstruction which may result in gangrene and necessitate an amputation. It was further shown that the sudden pain experienced by the patient on the ship could have been caused by such an embolism, and that ordinarily a clot or thrombosis in an artery will extend with the flow of the blood below but not much above the point of formation; and also that the clot found in the artery at the knee in the instant case had the structure and composition of an embolus originating in the heart.

The report of Dr. Alvin P. Long, Jr., who graduated as a physician in 1948 and had been the resident pathologist at the hospital since 1950, showed a clot in the popliteal artery at the knee six inches in length, which was red and glistening at the ends and slightly gray in the middle. Without prior knowledge of the report of the sprained ankle or of the diseased heart, he formed the opinion from the location and appearance of the clot that it was caused by an embolus from the heart.

Dr. R. O. Zetlin, an internist of ten years' experience, saw the patient for the first time at the hospital on November 7th and noted the vascular deficiency in the leg. He examined the man's heart and lungs to determine if his condition was suitable for the sympathectomy. He found a grossly irregular heart, that is, an auricular fibrillation and a slower pulse in each arm. He was of the opinion that there was an embolus in the leg from the heart. After the operation he found that there was no pulse in the left arm and he reached the conclusion that the patient was throwing emboli from the heart, one of which had lodged in the arm and one in the leg.

Dr. Walter B. Martin, a graduate in chemistry and a graduate of Johns Hopkins Medical School with thirty-five years' experience in the practice of medicine was engaged by the Insurance Company to examine the claim and make a report. He based his report on an examination of the patient on December 19, 1951 after the amputation, and upon an examination of the hospital reports, including the report of the pathologist and an earlier report which showed that the patient had been operated on for hernia two months previously and at that time was found to have a fibrillating heart. The doctor found the heart condition above described and the evidence of an occlusion or clot in the left arm and formed the definite opinion that the disabilities were not connected in any way with the injury to the ankle, but were caused by emboli thrown out from the heart, of which a small one lodged in the left arm and caused the obliteration of the pulse in the arm and a larger one lodged in the artery at the knee and interfered to such an extent with the circulation as to cause gangrene and necessitate amputation.

The record contains no qualification or contradiction of this testimony. It is true that the diagnosis of the injury is not susceptible of absolute certainty and that the formation of a spontaneous clot in the vasclar system of an aged person through a local trauma is a possibility; but in this case the source of the trouble was definitely located by the pathological examination at the knee and not at the ankle, and the evi-dence shows that the obstruction was sufficient to account for the pain which the claimant first noticed when working on the ship.

 It is now established that the scope of judicial review in a case of this kind is governed by the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq.; O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483; and the judgment must be reversed, because the findings of the Deputy Commissioner are not supported by substantial evidence on the record considered as a whole.

Reversed.