Van Voorhis, J.
An award in workmen’s compensation has been made to the widow of Jacob Miller, who died on August 10, 1950. He was last employed by a firm known as Krakauer Bros, where he had worked from January 31, 1949 to April 23, 1950, except for an absence of about five months due to a back injury consisting of a fractured vertebra. He received disability payments during this interval based on the certificate of his personal physician, Dr. Louis Granirer, that this injury resulted from moving a piano while at work. After he died, *280 his widow filed a claim against Krakauer Bros, for death benefits based on the theory that his death was caused by this fractured vertebra. Dr. Granirer refused to support that claim, certifying to the Workmen’s Compensation Board that in his opinion the industrial accident mentioned did not cause his death. That claim was superseded by another based on the theory “that decedent’s death may have resulted from an occupational disease, having been employed as a piano finisher and associated work for many years prior to his death.”
This man died from leukemia. He had worked as a piano or cabinet finisher for five different employers since 1928. A list of these employers was attached to the last-mentioned claim, and they were vouched into the proceeding. One of them was appellant National Cabinet Company. The theory of claimant became that the blood disease from which he died was caused by exposure to a chemical known as benzene—whose trade name is benzol -—which was contained in varnish removers utilized by each of the employers for whom he worked during this quarter of a century of his career.
The Referee who heard this workmen’s compensation proceeding called in an associate industrial hygiene physician of the Division of Industrial Hygiene and Safety Standards, New York State Department of Labor, to whom he issued the following direction: “It may be that substances used in one or more of these employments were injurious and causative factors in the death * * *. Will you please investigate and let me know what substances were used and whether or not you believe such substances were injurious.”
After executing this assignment, Dr. McBirney reported: “ As this disease is one in which there is no known cause, and there are no substances used in any of these work places which produce symptoms and signs similar to the signs and symptoms of this leukemia—an investigation is not able to disclose any causal relation.”
Dr. Granirer, decedent’s personal physician for 8 years who attended him at his death, was called as a witness for claimant, but declined to express an opinion that the leukemia resulted from his employment. Dr. Angrist, pathologist at the Queens General Hospital of the Department of Hospitals of the City of New York, on whose report the diagnosis of leukemia was *281 made, testified that leukemia of this kind varies from a few days to 23 years in producing death, is a cancerous process of the white cells of the blood and that he has no idea what factors prolong or shorten its duration. The Referee disallowed the claim, finding that it had not been established that death was due to the back injury sustained in moving a piano or to exposure to benzene. The Workmen’s Compensation Board reversed the Referee, finding:" That decedent developed leukemia as the result of work exposure to benzol during his employment with National Cabinet Company, that this was a slow starting disease within the provisions of Section 40 of the Workmen’s Compensation Law and that death resulted therefrom. We further find that the claim for death benefits was timely filed and that evidence does not establish any prior exposures that contributed to the fatal condition.”
The board recognized in this manner that it could not find for the claimant against any employer for whom the decedent worked earlier than National Cabinet Company without running afoul of the five-year Statute of Limitations prescribed by section 40 of the Workmen’s Compensation Law. It is not clear on what principle except the Statute of Limitations the other employments were excluded, where claimant testified that her deceased husband had done the same kind of work,since 1928. There was nothing to indicate when he contracted leukemia except its onset in 1950. The board seems to have acted on the assumption that causality was established against any one of these employers in whose favor the statute had not run unless it proved that the disease was contracted somewhere else, and to have ignored the affirmative evidence that, if this was an occupational disease, it was just as probable that he contracted it under other employers where the working conditions were _ substantially the same.
An equally serious defect in claimant’s case is that the causes of leukemia or its aggravation are unknown. This clearly appears from the testimony of claimant’s witness, Dr. Angrist, of the New York City Department of Hospitals, of Dr. McBimey, of the State Labor Department who was called by the Compensation Referee, and from the eloquent silence of decedent’s own physician. Whatever case claimant might have would depend entirely upon the testimony of Dr. Paul Reznikoff, *282 who had no contact with the deceased, and was called as an expert witness to answer hypothetical questions. This witness distinguished, as did all of the other medical witnesses, between leukemia and aplastic anemia, which was the disease involved in our decision in Matter of Zaepfel v. du Pont de Nemours & Co. (284 App. Div. 693, affd. 309 N. Y. 962). Aplastic anemia is the classical case of benzol poisoning, which gave rise to section 3 (subd. 2, par. 8) of the Workmen’s Compensation Law, implemented by the presumption supplied by section 47. Zaepfel did not die from cancer of any kind. He did not have leukemia. The statutory protection against benzol poisoning, a long-established industrial occupational disease, has no application to the facts of this case. Aplastic anemia is not leukemia. Indeed, there is testimony by Dr. Beznikoff himself that the effect of benzol is to reduce rather than to increase the number of white corpuscles, and that it has sometimes been injected as an antidote to leukemia, which consists of the uncontrolled multiplication of white blood corpuscles.
Dr. Beznikoff was guarded and hesitant about expressing any opinion concerning exposure to benzol as a cause of leukemia. He testified that he believes that a person exposed to benzol may develop this kind of leukemia. He said that nobody knows how much exposure it takes. The award depends entirely upon his statement that the incidence of leukemia ‘ ‘ is quite high in patients who have been exposed to benzol’’, and that “it is possible that this man’s leukemia resulted from his alleged exposure to inhalation of benzol or benzene
This lack of positiveness is no doubt commendable, as Judge Dye indicates, in expressing an opinion about the cause of a disease which is conceded to be unknown to medical science. It is true that the interjection by an expert witness of words like “ could produce ”, “ it is possible ” or similar expressions does not of itself destroy the probative force of the testimony if, as the Appellate Division said in Zaepfel, his opinion evidence is ‘ ‘ fortified by detailed explanation and other facts in the record which add to its reasonableness and probable correctness ” (284 App. Div. 693, 696, supra). The probative force of an opinion is not to be defeated by semantics if it is reasonably apparent that the doctor intends to signify a probability supported by some rational basis. Dr, Beznikoff made crystal clear, however, *283 that, when he used the word “ possible ” in answering the hypothetical question, he meant that and nothing more. He demonstrated this beyond peradventure when he was asked on cross-examination what made him feel that this decedent’s disease resulted from the cause mentioned, by replying: “I didn’t say that. I was asked whether this could follow benzol. I didn’t say this particular man had it”. (Italics supplied.) Asked whether this particular disease could have had its- cause outside of any employment exposure, Dr. Beznikoff replied: As I answered the previous attorney, most of the patients that we do see with this disease, we never find out a reason for it with any certainty.”'
General expressions of opinion in relation to cause and effect are permitted to a medical witness only where they are directed to showing that the condition of the particular plaintiff or claimant was such as to indicate that it was occasioned by the injury or injurious exposure claimed (Cole v. Fall Brook Coal Co., 159 N. Y. 59). This admission by Dr. Beznikoff that he was not testifying whether the leukemia of this decedent was caused by exposure to benzol nullifies any inference that could possibly be drawn in favor of claimant. His testimony thus loses “ * all probative force when supplemented and explained ’ ” by the testimony which he gave upon cross-examination (Matter of Kopec v. Buffalo Brake Beam-Acme Steel & Malleable Iron Works, 304 N. Y. 65, 71; Matter of Riehl v. Town of Amherst, 308 N. Y. 212).
Nobody contends that there is scientific understanding of the cause of this leukemia. The only possible basis for drawing an inference in favor of claimant from Dr. Beznikoff’s evidence, even if he had not cancelled it by saying that he was not speaking of this decedent, would be statistics indicating that in many instances leukemia follows benzol exposure without knowing why. It was along this line that Dr. Beznikoff began to testify that the incidence of leukemia “ is quite high” in patients who have been exposed to benzol. This line of testimony might have led to something had not the doctor added “I am sorry I can’t give you any statistics, but we don’t have them.”
Not every supposition of a witness concerning what might be has the force of evidence, even though he has been licensed *284 to practice medicine. If the witness is unfamiliar with any statistical data in the medical literature or in his own practice to give an inkling either to himself or to the court or board of how high the incidence of these cases is in situations of this kind, then the doctor’s assumption that it is “ quite high ” is without significance. The lack of any kind of statistical data, which in the absence of scientific understanding is all that there would be to go on, is the more inexplicable if the claim is well founded in view of the large number of persons who die of leukemia and of workers in industry who are exposed to benzol. If there were any observed correlation between the two, it is certain that a physician of Dr. Reznikoff’s standing would be in possession of the information.
Probably for this reason it has been written by Dr. W. C. H. Hueper, Chief of the C'ancerogenics Section of the National Cancer Institute of the United States Department of Public Health, that, whatever his individual predilection may be, “ At present, no country has officially recognized benzol leukemia as a compensable occupational disease. Several countries include aplastic anemia and related conditions caused by occupational exposure to benzol among this class of industrial disorders ” (Occupational Tumors and Allied Diseases, 1942, p. 599). This statement takes note of the fact, as do all of the medical witnesses in this case, that leukemia and aplastic anemia are different diseases. This distinguishes Matter of Zaepfel v. du Pont de Nemours & Co. {supra) which involved only the latter.
It is not customary, to be sure, to hold doctors to the strictness in testifying that was once required provided that it can be perceived that they are testifying with some reasonable degree of medical certainty. The form of the answers is less important than the context and background. Nevertheless, there must be some evidence of a basis for the opinion, and the acceptance in one case of the ‘ ‘ possible ’ ’ as meaning reasonable medical certainty does not justify treating every “possibility” as though it were enough to establish the facts sought to be proved. In the training of a scientist anything conceivable is a possibility. That is the first tenet accepted by the scientific mind. Many of the scientific discoveries and applied technologies today would have been thought by the average person to have been *285 impossible of attainment less than a generation ago. No trained scientist, medical or other, would have the effrontery to state today that space travel is impossible, that the discovery of a cure for leukemia or other forms of cancer is impossible, or that any other speculation is dogmatically beyond the realm of knowledge or accomplishment. Still that' would not justify a court in assuming that it is presently known or is presently achievable merely for the reason that a trained scientist has said that it is not impossible. We have to look at the background of the evidence, as was indicated in the opinion of the Appellate Division in the Zaepfel case.
Here not only does the employer-carrier’s expert deny causation, it is also denied or not affirmed by the decedent’s family physician, the pathologist of the New York City Department of Hospitals and the physician called in by the Compensation Eeferee himself from the Bureau of Industrial Hygiene of the Department of Labor. The latter two testified against the claimant’s position. The family physician was called but was not asked to testify to the cause, of the fatal disease. The medical witness on whom claimant depends confined himself to generalties and declined to be committed on whether this man died from exposure to benzol.
The courts have been confronted before with cancer cases, and this is not likely to be the last. This is not an isolated situation. Questions of causation are common to actions based on warranty, tort or workmen’s compensation proceedings (cf. Matter of Riehl v. Town of Amherst, 308 N. Y. 212, 217-218, supra). Would, for example, evidence that there are 4 to 11 times as many cases of lung cancer among cigarette smokers as among nonsmokers (Journal of National Cancer Institute, April, 1953, pp. 1237-1257) be sufficient to establish a cause of action for breach of warranty in the sale of cigarettes? The United States District Court in Pittsburgh has apparently held not (Pritchard v. Liggett & Myers Tobacco Co. [Miller, J.], decided May 3, 1960). There appear to be no decisions upholding causation in so complex a variety of the disease as leukemia. The cancer decisions in the courts where recovery has been allowed have dealt almost entirely with trauma, and there only in instances where the trauma occurred in the spot in *286 the body where the pre-existing cancer was and the symptoms of its aggravation were immediately apparent (e.g., in compensation cases, Matter of Roth v. Curtiss-Wright Corp., 269 App. Div. 916; Matter of Avesato v. Morrell-Brown, 7 A D 2d 796; Whittle v. National Aniline & Chem. Co., 266 Pa. 357; Lucas v. Haas Coal Co. 118 Pa. Super. Ct. 182; Atlantic Coast Line R. R. Co. v. Brown, 82 Ga. App. 889—under the Federal Employers’ Liability Act, in Charleston Shipyards v. Lawson, 227 F. 2d 110-—in negligence actions, Dalgleish v. Oppenheim Collins & Co., 302 Pa. 88; Smith v. Primrose Tapestry Co., 285 Pa. 145; Winchester Milling Corp. v. Sencindiver 148 Va. 388). In all of those cases the immediacy of the symptoms of aggravation of the cancer by a traumatic injury suffered in the area where the cancer was located was accepted as a substitute for scientific evidence or understanding of cause and effect. Absent that, damage claims of this nature have been dismissed on the law for lack of evidence of causation (Sikora v. Apex Beverage Corp., 282 App. Div. 193, affd. 306 N. Y. 917; Dennison v. Wing, 279 App. Div. 494). In the Sihora case it was written for the unanimous Appellate Division by Peck, P. J.: “ In the absence of a direct blow to the site of the cancer or spreading into surrounding areas, there is no adequate basis for believing that the growth of the cancer was in any way affected or accelerated by plaintiff’s fall ” (p. 197). The dismissal of the complaint was unanimously affirmed (306 N. Y. 917).
Fracture of the left clavicle and contusion of the left shoulder and upper chest was likewise held to be insufficient to establish aggravation of breast cancer in Dennison v. Wing (279 App. Div. 494, supra). The court said, again per Peck, P. J., that the ‘ ‘ cancer must develop exactly at the site of the injury ’ ’ (p. 496). The quandary which confronts a plaintiff or claimant in this type of case regarding the time factor was thus described. “ The type of cancer here involved was a very slow growing cancer. Plaintiff relies- on that fact to account for the lapse of three and one-half years between the accident and the development of the cancer and as the .explanation of why in the intervening three and one-half years she never called the breast pimple from which the cancer developed to the attention of any doctor. Nevertheless, in an attempt to connect the *287 cancer more proximately with the accident, plaintiff placed the discovery of the pimple from which the cancer grew at a time only two months after the accident * * *. We are satisfied that the breast cancer, from which plaintiff unfortunately suffered was not caused by the accident. ’ ’ (p. 497). A workmen’s compensation award was set aside and the claim dismissed in Schapiro v. Wanamaker (197 App. Div. 810, 814), one of the grounds for dismissal being that the breast cancer was not brought to light until seven months after the claimant pulled out a drawer which fell on her breast. There, as here, a medical expert for claimant testified to the effect that ‘ ‘ there is a certain amount of evidence that cancer may follow ’ ’, but like Dr. Reznikoff he disclaimed any scientific knowledge of the nature of the cause.
A compensation award was affirmed without opinion in Vanderslice v. Young (235 N. Y. 574). The syllabus shows the facts there to have been that an infected hand resulted in general blood poisoning which spread up the side of claimant to his arm pit, and reached the deep cervical glands under the right clavicle, near the thoracic duct. Cancer was manifested in these glands Immediately after they were reached by the infection, which spread to the tongue and tonsils, resulting in an operation two months later, followed a month after that by a hemorrhage from which he died.
An interesting case in an intermediate appellate court in California is Hagy v. Allied Chem. & Dye Corp. (122 Cal. App. 2d 361), where a woman was allowed to recover against a manufacturer of sulphuric acid for the aggravation of cancer of the larynx as a result of driving in an automobile through dense smog. The smog was so thick that she lost consciousness, and after she had been revived the evil effects of the cancer of the larynx became immediately apparent. In all of the decisions; where recovery has been allowed, the cancerous condition has been manifested immediately after the occurrence on which liability has depended. In the present case, the onset of leukemia did not occur until several years after his employment by appellant had ended.
We recognize that the scientific repugnance to the principle of “post hoc, ergo propter hoc’’ cannot fully extend to the law, and that, as in cases of circumstantial evidence, we regard *288 as proof that which would be rejected by the scientist. Nevertheless, there comes a point even in legal thinking where the relationship of cause and effect becomes too attenuated to be regarded (Laidlaw v. Sage, 158 N. Y. 73). An illustration of the correct legal approach to the problem is found in Stubbs v. City of Rochester (226 N. Y. 516) where the cause of disease was reached by process of elimination of other causes.
In the case at bar, causation has not been established. This is true not only on account of the considerable number of past employers of the decedent, engaged in the same operations where he was exposed to the same hypothetical dangers, without any clear showing that he contracted this disease while at National Cabinet Company but, even more importantly, for the reason that without any scientific evidence of causation there is likewise an absence of any statistical basis for opinion based on post hoc, ergo propter hoc, as claimant’s physician admits, and as is clearly apparent. The speculative nature of Dr. Reznikoff’s conclusions, appearing from his own testimony, and in the face of the testimony of all of the other doctors on both sides of the case, renders the result reached too conjectural for recognition in a court of law. The probative force of an immediately grievous aggravation of a cancerous condition by trauma or some other agent is totally absent in this ease. Here, in. addition to the other weaknesses in claimant’s case, is a long lapse of time before leukemia was discovered after he had ceased to work for appellant employer. In testifying that leukemia can develop over a period of 20 years, Dr. Reznikoff did not recognize that an immediately observable aggravation is the only proof of causation that exists in the legal cases that have been decided.
In 1927 it was said by the Supreme Court of Appeals of Virginia (Winchester Milling Corp. v. Sencindiver, supra, p. 399): “ Courts have in general found no difficulty * * * in applying the ordinary rules of evidence, and in drawing conclusions of cause and effect from established facts * * *. This, we doubt not, courts will continue to do with a full sense of justification and without apology until the cause of cancer is definitely and scientifically established.”
If what this statement means is that the courts will not in all instances demand scientific demonstration of cause and *289 effect relationships bnt will insist only on practical probability, it is correct. But if it is to be used as a fulcrum to establish a rule that a question ©f fact arises whenever a medical expert testifies in measured terms that an asserted cause of a disease is possible, then it is erroneous. Otherwise for so long as the causes of a disease — like cancer — are unknown to science, everyone contracting the disease could secure medical testimony that it is “ possible ” that the disease is contracted from a wide variety of causes, choosing in each instance the particular possibility having the greatest promise of holding liable some responsible defendant. Any cancer expert could readily state that cancer could be caused by virus infection or by exposure to automobile exhaust fumes, sunlight, radiation, smog, smoking, hormone imbalance or according to any other theory which has been entertained by researchers or specialists as a possibility. Is a malpractice suit pending against some doctor who has given cortisone or ACTH as medicine? Then appears a medical witness who testifies that possibly cancer is caused by hormone imbalance induced thereby. Is it an action for breach of an implied warranty in the sale of cigarettes? Then the medical witness will testify that cigarettes could be a cause of lung cancer. Is it X ray or working in a garage where there have been exhaust fumes? Then the “ possibility ” doctrine is adapted to creating questions of fact in those fields —and the same with benzol exposure and leukemia. Such a doctrine would overturn the rule that the burden is on the party asserting that a disease is based on actionable facts to prove causation (Stubbs v. City of Rochester, supra). It would mean that, wherever such a cause is possible, the burden rests on the opposite party to prove that the disease resulted from something else. Consequently, for so long as the causes of the disease are unknown to medical science, the claimant or plaintiff can always recover—if the trier of the fact is favorably disposed—since no one can prove that the disease had other causes. This is a perversion of the normal rule that the disease must have resulted from the occupation and that the burden of proving causation is upon the party asserting it. The law does not intend that the less that is known about a disease the greater shall be the opportunity of recovery in court.
*290 The Appellate Division majority thought that a question of fact was indicated here by the testimony of appellants ’ witness that some experts, specialists and authorities “feel just the opposite ” from himself on this question. Every medical researcher or specialist would be proud to predict the cause or causes of leukemia or other forms of cancer, and turn out to be right. This does not mean that each doctor’s pet theory is more than an informed guess. The circumstance that some others “ feel just the opposite ” from Dr. Cotter does not mean that they are possessed of any more medical certainty than himself concerning the cause of leukemia. It is everyone’s guess what that may be. So the Appellate Division’s stressing that remark implies that they regarded the burden of disproving causation as resting on appellants rather than that the burden rested on claimant to prove it. That was erroneous. If Dr. Beznikoff’s guess was as good as Dr. Cotter’s concerning the cause of leukemia, then, according to that reasoning, the claimant should recover, even though nobody has any tangible knowledge concerning it. Even an informed guess falls short of any degree of medical certainty.
The order appealed from should be reversed and the claim dismissed.