**STRACHAN SHIPPING COMPANY**
et al., Plaintiffs,

v.

**C. D. CALBECK, Deputy Commissioner,**
et al., Defendants.

Civ. A. No. 12315.

United States District Court
S. D. Texas,
Houston Division.
Jan. 18, 1961.

Royston, Rayzor & Cook, C. A. Brown and E. D. Vickery, Houston, Tex., for plaintiffs.

William B. Butler, U. S. Atty., and Jack Shepherd, Asst. U. S. Atty., Hous-

ton, Tex., and Harold C. Nystrom, Acting Sol. of Labor, and Herbert P. Miller, Asst. Sol., U. S. Dept. of Labor, Washington, D. C., for defendant C. D. Calbeck.

W. Jiles Roberts, Houston, Tex., for claimant.

INGRAHAM, District Judge.

Strachan Shipping Company (hereinafter "employer") and their insurer, Texas Employers' Insurance Association, seek to have the court review and set aside as not in accordance with law a compensation order filed by Deputy Commissioner Calbeck (hereinafter "commissioner") on August 19, 1958, pursuant to the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. In the disputed order the commissioner awarded compensation to the widow and minor children of Matthew Gee, who died on October 4, 1957, allegedly as the result of an accidental injury which he sustained while working for employer. This court has jurisdiction by virtue of 33 U.S.C.A. § 921(b).

This action presents a single issue for decision: Is there reliable, probative, and substantial evidence in the record as a whole to support the commissioner's finding that the fertilizer incident of March 5, 1957 (to be developed fully hereinafter), resulted in decedent Gee's being wholly disabled from March 6, 1957, to October 3, 1957, and caused or accelerated his death on October 4, 1957, from lung cancer?

It is settled that the standards of review of an award under this act are fixed by the Administrative Procedure Act, 5 U.S.C.A. § 1009. O'Leary v. Brown-Pacific-Maxon, 1951, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483. Section 1009(e) provides:

"It (the reviewing court) shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * unsupported by *substantial evidence* * * In making the foregoing determinations the court shall review the *whole record* * * *." (Emphasis supplied.)

The following findings of the commissioner are attacked by the employer as being unsupported by substantial evidence on this record as a whole:

"(That Matthew Gee) sustained personal injury on March 5, 1957, that resulted in his death on October 4, 1957. * * *

"*The employee's death was the result of the natural and unavoidable progression of the injury and the conditions and the ailments that were proximately caused, aggravated or accelerated by the employment.* The injury and death arose out of and in the course of the employment. The chain of causation proceeded in a logical and orderly fashion and was direct and continuous from the date of injury to and including the day of death.

"As a result of the injury the employee was under medical treatment and was wholly disabled from March 6, 1957, to October 3, 1957 * * *." (Emphasis supplied.)

Inasmuch as the sole question presented is an evidentiary one it will be necessary to present a somewhat lengthy, detailed factual account. The transcript of the hearing before the commissioner is lengthy, involves complicated medical issues, and contains the testimony of six medical doctors.

Matthew Gee, deceased employee of plaintiffs, was assisting in loading a barge with triple superphosphate fertilizer at Port Adams, Houston, Texas, on March 5, 1957. In some manner the conveyor belt "choked up" and such fertilizer "splattered over" Gee. T. 13, L. 15, et seq. The deceased said he "was all choked up in his chest". T. 14 to 15. Up until this incident Gee appeared to be in good health. T. 15, 30. Claimant, Alberta Gee, widow of decedent Matthew, stated that when decedent came home from work on that day he complained about his chest. T. 52, L. 18; T. 53, L.

3.[1] Decedent was seen and treated by Dr. J. F. Rader on March 6, 1957. Dr. Rader took a history from Gee in which Gee said that the fertilizer got into his chest, made his chest, eyes, and nose hurt, and also created breathing difficulties. T. 73, L. 9–13. Gee was spitting up a little fertilizer dust; his throat was sore. T. 75, L. 1, 17.

Dr. Rader diagnosed Gee's condition upon the examination of March 6, 1957, as allergic bronchitis. Antibiotics were prescribed and applied in the ensuing days. By March 9th Gee was improved. However, on March 12th, Gee felt much worse. An x-ray of his chest made on that date by Dr. Rader showed a massive pleural effusion in the left lung. T. 76–80. Gee was admitted to a hospital on that same day; he remained in this hospital until April 6, 1957. During the period of confinement he was comfortable and was given combinations of antibiotics.[2] Hospital records show decedent was given passes to leave the hospital and even a weekend pass just prior to discharge.

Dr. T. R. Jones saw him in May 1957. X-rays revealed the continued presence of a massive pleural effusion. Dr. Jones was of the opinion that Gee had either tuberculosis or carcinoma of the lung. Studies for cancer cells were fruitless. Dr. Jones felt an operation useless, being convinced Gee had inoperable carcinoma. T. 225, L. 4, et seq. During August and September of 1957 decedent was in and out of the hospital. A definite diagnosis of carcinoma of the lung was made. Gee died on October 4, 1957.

An autopsy was performed by Dr. Erickson, an experienced and skilled pathologist. She testified that Gee had a carcinoma of the left lung. It had spread to all of the mediastinal and regional lymph nodes. It had gone to the heart, right lung, ribs, diaphragm, right kidney, and left adrenal gland. T. 170, et seq. Although admittedly incapable of giving a *precise* estimate, Dr. Erickson was of the opinion that in all reasonable medical *probability* the carcinoma had far antedated the fertilizer incident of March 1957. T. 175, L. 24; 176, L. 1–14; 177, L. 21; 178, L. 10; 179, L. 1, et seq.

With these basic facts in mind I turn to the testimony adduced before the commissioner in a hearing of July 1958. The only testimony in the record aside from medical witnesses came from two co-workers of Gee, who witnessed the fertilizer incident, and claimant Alberta Gee. In the main their testimony has been discussed, supra. A fair summary of lay testimony leads to these conclusions: (1) it was windy on March 5, 1957, and the conveyor belt with the fertilizer slipped; (2) all workers were subjected to the fertilizer to some extent, but Gee inhaled or swallowed a good bit more than the rest; (3) during the next few days Gee coughed and was choked up rather noticeably; (4) Gee had had no previous discomfiture of this order; and (5) decedent seemed improved fairly shortly. Decedent's wife felt he went downhill continually after March 5, 1957.[3]

---

1. Deputy Commissioner Calbeck specifically found as a fact the following: "In consequence thereof (the injury) he had burning of chest, nose and throat * * *." The record is devoid of support for this finding. Claimant's attorney alluded to such "burning" at the hearing, and he was promptly corrected as to the matter by insurer's counsel.

2. Claimant Alberta Gee declared "But for about a month (period of confinement) he seemed like he held up pretty good * * *." T.53, L.25. Cf. the commissioner's finding of a steady erosion

of decedent's position after March 5, 1957.

3. Alberta Gee testified as follows in T.53, L.21, et seq.:
"Q. Did he seem to go downhill from the date, March 5, 1957, until he died, as far as his health was concerned? A. Yes, he just continued, seemed like, to go down.
"Q. Was he— A. *But for about a month he seemed like he held up pretty good for about a month.*" (Emphasized portion deals with month immediately after March 5th.)

I come then to the medical testimony—claimant presenting one medical doctor and employer presenting five. Dr. J. C. Jones testified for claimant.[4] He was of the opinion that the fertilizer incident *might possibly* have aggravated Gee's pre-existing cancerous condition, when questioned on direct examination by claimant's attorney. Dr. J. C. Jones wavered considerably in this regard on cross-examination, however.[5] At any rate this was the only testimony—lay or medical—that found a link between the fertilizer incident of March 1957 and Gee's subsequent disability and death in October 1957.

On the other side, Dr. T. R. Jones, a specialist in lung diseases and a diplomate of the American College of Chest Physicians, examined Gee in May 1957 at the request of Dr. Rader. He felt that decedent had inoperable carcinoma of the lung. He testified that an operation might well have worsened matters. His testimony was clear on the existence of the malignancy prior to March 5, 1957. Having regard to uncertainties of cancer's growth and origin, he still felt it reasonably probable that there was no connection between the fertilizer episode and Gee's ensuing disability and demise. T. 229, L. 23, et seq. He doubted that aggravation occurred, unlike claimant's expert.[6]

Dr. E. A. Erickson, pathologist at the hospital where Gee died, had performed 350 autopsies on victims of lung cancer. As a result of her autopsy she doubted there was any connection between the fertilizer incident and Gee's later difficulties.[7] In answer to a question by claimant's attorney which was, "Can we exclude this fertilizer incident as hastening this man's death by at least a few minutes?" Dr. Erickson replied, "I think we can exclude the fertilizer incident." T. 194, L. 21.

Dr. H. S. Gallagher, pathologist connected with the M. D. Anderson Cancer Hospital in Houston and the University of Texas Post-Graduate School of Medicine, shared Dr. Erickson's view. Medical probabilities, in his opinion, made most tenuous any connection between the fertilizer event and later happenings to Gee.[8] The comparatively minor nature

---

4. It might be noticed that Dr. J. C. Jones, who described himself as a "specialist" in internal medicine, was not a diplomate of the American Board of Internal Medicine. He had been in practice one year. There was no testimony of any special training or experience in cancer-techniques. He had never treated decedent, nor had any previous connection with Gee's pathology.

5. Consider this exchange between Dr. J. C. Jones and employer's attorney at T. 329, L.5, et seq.:

 "Q. Well, now, then, when we are talking about this question of the fertilizer incident to some slight extent, I believe is what you said, may have aggravated the cancer condition— A. I don't know whether it was slight or otherwise. * * *

 "Q. Or that it just happened to arrive at the time seven days after the fertilizer incident that his symptoms became noticeable to the man; that is true, isn't it? A. That's right."

6. The crucial series of questions to Dr. T. R. Jones are in T.229, L.23, et seq.:

"Q. Now, then, do you think this fertilizer incident in any way aggravated the cancerous condition in his lung? A. No, I don't think the fertilizer had anything to do with the cancer * * *. I mean, I think the cancer is going to kill the man and these incidental things that happen along, I don't think they have any bearing on the final outcome of his condition."

7. The key exchange is in T.178, L.22, et seq.:

 "Q. * * * (C)an you tell us whether or not in your opinion, there is any relationship at all between the fertilizer incident * * * and this man's death * * *? A. In my opinion, I do not believe there is any connection with the fertilizer incident and the onset of his disease and the progression of his disease. * * *

 "Q. Now, then, will you tell us whether or not in your opinion this fertilizer incident in any way aggravated the cancer? A. I doubt it very much. It sounds most unlikely."

8. Dr. Gallagher testified in T.267, L.5, et seq., as follows:

of the fertilizer accident is re-emphasized throughout the testimoy of Dr. Rader, who first examined Gee. (See T. 71, et seq.). Dr. J. Herrmann shared his colleagues' views.[9]

The applicable standard of review—substantial evidence on the record as a whole—received its outstanding interpretation in Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The court made clear it was no longer permissible to consider simply that evidence which supported the administrator, but that the entire record must be examined and due appraisal made of proof which detracted from the weight of the evidence in support of the controverted order. A court was to set aside an administrative decision which it could not conscientiously find supported by substantial evidence. Reviewing courts were not to abdicate the conventional function of the judiciary in an excess of accommodation to administrative expertise. The standard enunciated in Universal Camera and in the Administrative Procedure Act was designed to thwart the practice of some administrators and agencies of relying upon surmise, suspicion, and incredible evidence. An award against an employer, precisely and simply because he was an employer, was no longer to be tolerated.

█ The companion case of O'Leary v. Brown-Pacific-Maxon, supra, is fraught with meaning for our function under the Longshoremen's and Harbor Workers' Act. It made clear that Universal Camera doctrine was applicable to this maritime compensation statute. It also demonstrates that even under the principles of review set forth in Universal Camera a wide latitude must be accorded the findings of the deputy commissioner. We are not permitted to weigh the preponderance of the evidence. That the reviewing court might have reached a different result than the administrator is quite immaterial if the deputy commissioner's findings have the support of substantial evidence. In cases of closely conflicting inferences, the administrator's are to prevail. If doubt exists as to whether the findings of the deputy commissioner are supported, that doubt must be resolved in his favor. Southern Stevedoring Co. v. Voris, 5 Cir., 1951, 190 F.2d 275; Delta Stevedoring Co. v. Henderson, 5 Cir., 1948, 168 F.2d 872. In short, while the reviewing court must not remain mute in the face of a baseless award of compensation, it must not usurp the administrative fact-finding process. The district courts are without power to conduct "de novo" reviews.

█ The parties agree in the main to these ground rules for this dispute. They differ to some degree over the respect the deputy commissioner must accord medical testimony in a case like the present one, where the basic issues are complicated medical ones. The employer argues that the questions involved here are medical questions, which an inexperienced layman, such as the deputy commissioner, could not answer from his own experience. It is the employer's view that the deputy commissioner could not, on these technical cancer inquiries, lay claim to a prescience that would permit him to pierce the veil of scientif-

"Q. Now, then, still bearing in mind the fertilizer incident of March 5, 1957, and the fact that this man died almost seven months to the day later on October 4, 1957, would you tell us whether or not in your opinion the fertilizer incident in any way hastened this man's death or brought it on any sooner than it otherwise would have occurred? A. I do not believe that it did."

9. Dr. Herrmann declared his opinion of causation as follows in T.211, L.16, et seq.:

"Q. Let me ask you, Dr. Herrmann, do you think that the fertilizer incident in March, 1957, as related to you by Mr. Gee in any way hastened his death? A. No, I don't. I think if I may say so; I think it's almost unfortunate that the incident didn't happen sooner, so that, if it did cause a bit of respiratory embarrassment, that he would have been seen at an earlier date when perhaps his tumor would have been resectable."

ic knowledge—even by seizing the familiar, much-vaunted shibboleth of expertise. The government, on behalf of the deputy commissioner, argues that medical opinion testimony is only advisory and is not conclusive upon the trier of fact. Where the cause of a disabling condition is shrouded in doubt as in the case of cancer, says the government, the trier of fact may form his independent conclusion from all the testimony and the surrounding evidence. I am inclined to agree with the deputy commissioner in this regard. The government's position would appear to be supported by Hampton Roads Stevedoring Corp. v. O'Hearne, 4 Cir., 1950, 184 F.2d 76, and Crescent Wharf & Warehouse Co. v. Cyr, 9 Cir., 1952, 200 F.2d 633. In rejecting employer's contention that the deputy commissioner is in any rigid, mechanical sense "bound" by medical testimony, I am not saying that such testimony can be airily disregarded on complicated medical issues. Indeed, awards based on wholly incredible lay testimony or preconceived, rigid economic views can never stand. I merely state that medical testimony must be balanced along with the rest of the evidence in applying the substantial evidence rule of review.

■■ After careful consideration of the hearing record, paying heed to the liberal construction called for in remedial legislation, the court is compelled to hold that the deputy commissioner's award is simply not supported by substantial evidence in the record as a whole. Claimant has the burden of establishing a causal relation between the minor fertilizer incident of March 5, 1957, and the disability of the deceased extending to October 3, 1957, and the causal relation between that incident and the death of Gee on October 4, 1957. To carry such burden there must have been as much evidence in the record as would have justified submission of the case to a jury of laymen upon a jury trial. The Supreme Court expressly so held in Universal Camera, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, at page 462. I am constrained to find that claimant failed to show anything other than that the cancer was merely contemporaneous or a coincident following the relatively unimportant fertilizer incident. The lay testimony lends no support to any causation theory. They inform only that decedent had a soreness of throat and chest and coughing following inhalation of the fertilizer dust. Application of antibiotics apparently remedied these symptoms. The one doctor's testimony which lends any support at all to claimant was unconvincing under cross-examination. Arrayed against this scanty support for the deputy commissioner's finding was the testimony of five doctors, three of them experts in the field. It is only fair to state that the following points were made repeatedly by these five witnesses: (1) in all reasonable medical probability and based upon the x-rays of March 12, 1957, Matthew Gee's carcinoma of the left lung preceded by a considerable period the fertilizer incident; (2) his condition on March 5, 1957, in view of the massive pleural effusion, had progressed to an inoperable state; (3) inhalation of the fertilizer certainly did not *cause* the cancer; (4) in all reasonable medical probability inhalation of the fertilizer did not *accelerate* the cancer's growth; (5) in all reasonable medical probability inhalation of the fertilizer did not *aggravate* the cancer so as to shorten Gee's life; and (6) in all reasonable medical probability there was no connection between the fertilizer occurrence and Gee's disability and ultimate death.

I have prefaced the conclusions of the doctors with "in all reasonable medical probability". In the present state of medical learning upon carcinoma, positive, unequivocal statements would be foolhardy. Claimant has proved her case only in the sense that an extremely remote causative agent *might possibly* cause, accelerate, or aggravate cancer. So long as cancer remains mysterious, anyone in claimant's position could doubtless secure medical testimony that it is "possible" that the malady is gotten from a variety of causes, always selecting, of course, that possibility holding out

the greatest promise of recovery from some responsible defendant. Such a "possibilities" doctrine might ultimately overturn even the burden of proof here. If a cause is possible, says claimant, let the employer prove the disease was caused by another agency. A recent New York case, dealing with strikingly similar facts, properly stated, "The law does not intend that the less that is known about a disease the greater shall be the opportunity of recovery in court." Miller v. National Cabinet Co., 1960, 8 N.Y.2d 277, 168 N.E.2d 811, 818.

Necessarily, cases involving the substantiality of evidence depend entirely upon the peculiar facts of each case. Citation of authority is obviously less helpful in this type of situation than in normal cases. A few pertinent authorities deserve brief attention, however. In Colonna's Shipyard, Inc. v. O'Hearne, 4 Cir., 1952, 200 F.2d 220, the question involved was whether a causal relation existed between an injury to claimant's ankle on October 31, 1951, and the amputation of his leg on December 7, 1951. The deputy commissioner found that the amputation of the leg was caused by and flowed from the injury which he had sustained to his ankle in the course of his employment. There was lay testimony similar to that at bar. However, there was medical evidence that there was a *possibility* that a small local trauma, such as occurred to claimant, might cause a clot resulting in amputation. There was strong testimony from three other doctors to the contrary. The court held that the greatly outweighed medical testimony could not stand, and the deputy commissioner's award was enjoined. The analogies between Colonna's Shipyard and the instant case seem evident. Jacoby v. Texas Employers' Ins. Ass'n, Tex. Civ.App.1958, 318 S.W.2d 921, a Texas workmen's compensation decision, deals with an analogous cancer causation problem, and upon similar evidence, compensation is denied. The text in 2 Larson's Workmen's Compensation Law, Sec. 79.-54, p. 303, is pertinent. The conclusions expressed therein lend support to my rejection of this award. Claimant places much stress on Sentilles v. Inter-Caribbean Shipping Corp., 1959, 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed. 142. That case, however, did not involve judicial review of an agency award governed by the standards of the Administrative Procedure Act. Sentilles is inapposite, for it was not a compensation case and concerned jury action. The parties cited numerous cases in a series of lengthy briefs. To canvass this mass of authorities would unduly lengthen this opinion without commensurate reward. The authorities have been examined; they impose no obstacle to this result.

The award of the deputy commissioner will be enjoined and set aside. The clerk will notify counsel to draft and submit judgment accordingly.