Gary D. GOTLIN, et al., Plaintiffs,

v.

Gilbert S. LEDERMAN,
et al., Defendants.

Nos. 04 Civ. 3736 (ILG),
05 Civ. 1899 (ILG).

United States District Court,
E.D. New York.

May 21, 2009.

Bruce G. Behrins, Behrins & Behrins, P.C., Staten Island, NY, for Plaintiff.

Mary Elizabeth Pearson, Kopff, Nardilli & Dopf, New York, NY, for Defendant Scott Gilbert Lederman, M.D.

Anthony Albert Lenza, Jr., Amabile & Erman PC, Staten Island, NY, for Defendants Philip Jay Silverman and Irina Grosman.

Melissa Melzer, Nancy J. Block, Anthony M. Sola, Martin Clearwater & Bell LLP, New York, NY, for Defendants Staten Island University Hospital, et al.

### MEMORANDUM AND ORDER

GLASSER, Senior District Judge:

### INTRODUCTION

These actions are brought on behalf of 20 Italian nationals, all of whom succumbed to various types of cancer, against three physicians who treated them, the hospital where they were treated, and various directors, officers, and employees of the hospital. The claims are for medical malpractice, hospital and medical negligence, lack of informed consent in violation of New York Public Health Law § 2805–d, consumer fraud and false advertising in violation of New York General Business Law §§ 349–350, and wrongful death. The spouses of these decedents have brought claims for loss of consortium. The defendants now move for summary judgment of all claims against them. They also argue that some of the claims are barred by the statute of limitations and that the Court lacks personal jurisdiction over four of the defendants due to ineffective service of process. The Court finds that two of the deceased plaintiffs have proffered adequate evidence to create a triable issue of fact as to their medical malpractice claims and that the other plaintiffs have otherwise not proffered enough evidence to sustain their claims. The defendants' motion for summary judgment is granted in part and denied in part.

### FACTS[1]

The present motion applies to two separate but indistinguishable causes of action arising out of the same or similar factual circumstances. Deceased plaintiffs Giuseppe Caramanna Bono ("Caramanna"), Dino Brovelli ("Brovelli"), Dino Cattai ("Cattai"), Francesco Centore ("Centore"), Giuseppe DiGanci ("DiGanci"), Roberto Ettore ("Ettore"), Massimo Facchini ("Facchini"), Giancarla Pesci ("Pesci"), and Antonio Roda ("Roda")—through Gary D. Gotlin, the Richmond County Public Administrator—brought claims against the defendants on August 27, 2004, under civil docket number 04 CV 3736 ("Gotlin I"). Deceased plaintiffs Patrizia Cataranelli ("Cataranelli"), Massimo Cervone ("Cervone"), Anna Assunta Spirito Guerriero

---

1. Neither the defendants nor the plaintiffs submitted a statement of undisputed facts pursuant to Local Rule of Civil Procedure 56.1.

("Spirito"), Stefano Baccichetto ("Baccichetto"), Giuseppina Busti Billi ("Busti"), Gemma Emilia Caberti Amato ("Caberti"), Giuseppe D'Ambrosio ("D'Ambrosio"), Giovanna Deodato Tiso ("Deodato"), Bianca Maria Giovannini Lucchi ("Lucchi"), Piera Mattaini Landoni ("Landoni"), and Vincenzo Scurto ("Scurto")—through Public Administrator Gotlin—brought claims against the defendants on April 19, 2005, under civil docket number 05 CV 1899 ("*Gotlin II*") and amended those claims on June 8, 2005. The surviving spouses of these decedents have also brought derivative claims for loss of consortium.

The defendant physicians are Gilbert S. Lederman, M.D. ("Lederman"), Philip Jay Silverman, M.D. ("Silverman"), and Irina Grosman, M.D. ("Grosman"). The plaintiffs have also brought suit against Lederman's professional corporation, Gilbert Lederman, M.D. P.C.[2] The defendant hospital corporations are Staten Island University Hospital ("SIUH"), North Shore–Long Island Jewish Healthcare, Inc. ("Healthcare, Inc.") and North Shore–Long Island Jewish Health System, Inc. ("System, Inc."). The defendant directors, officers, and employees of the hospital corporations are Joseph Conte, Maria Gelmi-Nourbaha, Andrew J. Passeri, Alfred L. Glover, Ralph J. Lamberti, Gerald Ferlisi, Anthony C. Ferreri, Betsey Mercereau, Rick J. Varone, Joseph R. Pisani, Dale Tait, John L. Costello, John A. D'Anna, and John M. Shall (collectively, with SIUH, Healthcare, Inc. and System, Inc., "the Hospital Defendants").

In a Memorandum and Order dated May 3, 2005, the Court provided background for these claims:

Plaintiffs allege that in late 2001 or early 2002, defendants created an International Patient Program through which they marketed the Fractionated Stereotactic Radiosurgery ("FSR") cancer treatment method to Europeans and, in particular, Italian nationals. FSR involves precision radiation using multiple, finely contoured beams from many different angles directed at the cancer, minimizing radiation to normal healthy tissue.... Plaintiffs alleged that defendant physicians and hospitals treated them and hundreds of Italian nationals using this method. The FSR method was discontinued in late 2003 or early 2004.

Defendants marketed FSR to plaintiffs and the public at large in various ways, including literature, television, radio, in-person seminars and the Internet. Plaintiffs allege that those advertisements contained "misleading, fraudulent, deceitful, and shocking claims, statements, and information." .... Plaintiffs allege they relied on these representations to their detriment and that defendants "preyed upon the plaintiffs' fears and hopes at their most vulnerable time, when stricken with cancer." Plaintiffs were deceived into visiting the United States for FSR treatment based on promises that the procedures would help them. Such representations deprived plaintiffs of the opportunity to seek other necessary care and the FSR treatment caused plaintiffs pain and worsened their medical conditions. Most died shortly after receiving the treatment in a matter of weeks or months.

*Gotlin I*, 367 F.Supp.2d 349, 352–53 (E.D.N.Y.2005) (Glasser, J.) (internal citations and quotation marks omitted); *see also Gotlin II*, No. 05 Civ. 1899(ILG), 2006 WL 1154817 (E.D.N.Y. April 28, 2006) (Glasser, J.) (reciting essentially the same allegations).

2. Hereinafter, the Court will refer to both Lederman and his professional corporation simply as "Lederman."

### 1. Promoting FSR treatment in Italy

In support of these allegations, the plaintiffs have proffered the statement of Salvatore Conte ("Conte") who states that he worked in Italy on behalf of SIUH and at the direction of Lederman to "publicize and promote the Stereotactic Radiosurgery treatment in Italy...." Declaration of Bruce Behrins ("Behrins Decl."), dated Oct. 10, 2008, Ex. B ¶¶ 2–4. Conte promoted the FSR treatment through an internet website, on television programs, in newspaper and magazine articles, and at medical conferences at which Lederman would present prospective patients with the success rates associated with FSR treatment. *Id.* ¶¶ 6, 8–9, 10. Prospective patients at these conferences were also provided with printed brochures and videocassettes from SIUH that promoted the benefits of FSR treatment. *Id.* ¶ 12. According to Conte, Lederman "was very determined in receiving the highest number of potential patients as possible," and he instructed Conte "to inform as many patients as possible about the program." *Id.* ¶ 23. Conte also stated that Lederman was willing to treat any patient no matter how terminally ill he or she was. *Id.* ¶¶ 23–24. Conte stated that SIUH paid for his office in Naples, Italy, where he would further promote the FSR program to prospective patients, and that SIUH paid him a commission of $1,750, equal to 10% of the $17,500 cost of treatment, for every patient that he referred. *Id.* ¶¶ 15–18. Conte also asserts that Lederman, Silverman, and Grosman would introduce him and refer to him as a medical doctor and provided him with business cards that identified him as "Salvatore Conte, M.D." despite the fact that he was not a medical doctor. *Id.* ¶¶ 21–22.

Conte does not suggest, however, that any of the defendants made material misrepresentations about the success rates of the FSR treatment program, about the individual results that patients were told to expect, or that they engaged in other deceptive acts.

### 2. Deviation from the standard of care

The plaintiffs proffer the unsworn expert report of Paul R. Gliedman, M.D., ("Dr. Gliedman") and Louis B. Harrison, M.D., ("Dr. Harrison") in support of the medical malpractice, hospital and medical negligence, and Public Health Law § 2805–d claims. *See* Behrins Decl., Ex. Y (the "Plaintiffs' Disclosure of Expert Testimony Pursuant to FRCP 26(a)(2)"). In the report, Dr. Gliedman and Dr. Harrison stated that there were deviations from the standard of care in the treatment of 12 of the 20 deceased plaintiffs: Cattai, Caramanna, D'Ambrosio, Roda, Giovannini, Centore, Caberti, Busti, Spirito, Landoni,[3] Facchini, and Scurto, *see id.*, but they do not make any statement as to which of the three defendant doctors were responsible for those deviations. In the cases of deceased plaintiffs DiGanci, Deodato, Cervone, Ettore, and Pesci, the plaintiffs' experts expressed their "concerns" or "issues" with the care that was provided but notably did not state that a deviation from the standard of care had occurred. The expert report voiced no criticism of the treatment given deceased plaintiffs Brovelli, Baccichetto, and Cataranelli. *See id.*

### 3. Proximate cause

In their depositions, Dr. Gliedman and Dr. Harrison testified that they could not state an opinion with reasonable medical

---

**3.** Landoni is referred to in the plaintiffs' medical expert report as "Piera Mattaini." *See*

Behrins Decl., Ex. Y at 10.

probability as to whether plaintiffs Bacci-chetto, Brovelli, Busti, Cataranelli, Cer-vone, D'Ambrosio, Deodato, DiGanci, Et-tore, Facchini, Landoni, Pesci, Roda, and Scurto suffered an injury that was proxi-mately caused by the treatment they re-ceived at SIUH.[4] As to Centore, Lucchi, and Spirito, Dr. Harrison could not testify with reasonable medical probability wheth-er any deviation from the standard of care proximately caused these plaintiffs a short-er life, pain and suffering, or loss of enjoy-ment of life.[5] Dr. Gliedman, however, tes-tified that these plaintiffs were injured in that their time was wasted receiving treat-ment that was unwarranted given their medical condition.[6]

The plaintiffs' expert report only dis-cussed proximate cause in the cases of Caramanna, Cattai, and Caberti. As to Caramanna, the plaintiffs' experts stated that "the delivered radiation therapy," which in their opinion constituted a devia-tion from the standard of care, "*may* have contributed to the death of this pa-tient. . . ." Behrins Decl., Ex. Y at 5 (em-phasis added). Neither Dr. Gliedman nor Dr. Harrison elaborated on that opinion in

their depositions other than to say that SIUH had not departed from any standard of care in the treatment of Caramanna. *See* Block Decl., Ex. 22 at 115:12–15, Ex. 23 at 76:20–78:20. As to Cattai, neither expert could render an opinion with rea-sonable medical certainty that the treat-ment Cattai received at SIUH shortened his life or caused him pain and suffering. *See id.*, Ex. 22 at 123:15–22, Ex. 23 at 95:11–15. The plaintiffs' expert report noted that he developed gastrointestinal bleeding several months after receiving FSR treatment but stated that its cause "is not discernible from the submitted rec-ords." Behrins Decl., Ex. Y at 4. Elabo-rating on this in his deposition, Dr. Glied-man testified that he could not say with reasonable medical probability that the FSR treatment that Cattai received was the cause of the bleeding. *See* Block Decl., Ex. 22 at 127:16–20. Dr. Harrison also testified "it's impossible to know ex-actly what caused the problem." *Id.*, Ex. 23 at 87:14–21, 91:4–12. As to Caberti, the plaintiffs' expert report stated that "there was a deviation from the standard of care in this case. The patient should have re-

---

4. *See* Declaration of Nancy Block ("Block Decl."), dated Sept. 8, 2008, Ex. 22 at 63:3–20, Ex. 23 at 67:10–68:3 (as to Baccichetto); Ex. 22 at 72:3–18, Ex. 23 at 71:17–72:8 (as to Brovelli); Ex. 22 at 74:16–75:7, Ex. 23 at 75:6–76:4 (as to Busti); Ex. 22 at 119:3–120:11, Ex. 23 at 79:13–82:11 (as to Catara-nelli); Ex. 22 at 131:2–17, Ex. 23 at 112:16–114:2 (as to Cervone); Ex. 22 at 132:25–133:18, Ex. 23 at 121:19–122:11 (as to D'Am-brosio); Ex. 22 at 134:25–135:8, 136:6–22, Ex. 23 at 124:7–22 (as to Deodato); Ex. 22 at 143:11–144:1, Ex. 23 at 126:20–127:12 (as to DiGanci); Ex. 22 at 146:12–147:3, Ex. 23 at 128:25–129:16 (as to Ettore); Ex. 22 at 149:3–18, Ex. 23 at 130:18–131:5 (as to Fac-chini); Ex. 22 at 157:6–22, Ex. 23 at 134:10–23 (as to Landoni); Ex. 22 at 163:22–164:13, Ex. 23 at 136:11–137:3 (as to Pesci); Ex. 22 at 166:5–20, Ex. 23 at 138:24–145:2 (as to Roda); Ex. 22 at 168:12–169:3, Ex. 23 at 146:25–147:24 (as to Scurto).

5. *See* Block Decl., Ex. 23 at 100:7–18, 106:5–107:18 (as to Centore); at 132:11–133:4 (Luc-chi); at 153:2–15 (as to Spirito).

6. *See* Block Decl., Ex. 22 at 140:5–141:9 (as to Centore, he stated, "[t]he patient had no indi-cations for the treatment, so therefore, spent time getting therapy that really had no poten-tially curative or palliative potential, so in that sense, the patient's time was taken away"), at 152:21–24 (as to Lucchi, he stated, "the radia-tion had no curative or palliative intent or hope, so the patient received treatment she did not need, and therefore, lost time of en-joyment"), at 170:8–171:6 (as to Spirito, he stated, "the answer would be, again, loss of enjoyment of life, getting the treatment that she did not—had not potential to benefit from").

ceived steroids as soon as it was known that there was a mass in the brain. This would have given some relief of her symptoms." Behrins Decl., Ex. Y at 8. The report neither explains what the "symptoms" were nor whether Caberti was experiencing pain or suffering, but it does state that Caberti experienced occasional head pain for which she did not require analgesics and that, after an MRI confirmed that a lesion with surrounding edema was compressing her brain stem, Caberti's "condition deteriorated and eventually was so poor that the family brought the patient to the Emergency Department at Staten Island University Hospital with complaints of 'unable to eat, balance being off and wanting further evaluation.'" *Id.* Dr. Gliedman was asked during his deposition whether the failure to treat Caberti with steroids shortened her life expectancy:

Q. Given her condition when she first arrived at Staten Island University Hospital with this degree of metastasis to, among other things, the brain and the kidney, you cannot state an opinion with reasonable medical probability that the care and treatment rendered to the patient at Staten Island University Hospital shortened that patient's life expectancy, true?

A. I think that the—lack of some of the care that was given may have shortened her life.

Q. You're referring to not employing steroids?

A. Correct.

Q. You say it may have. That means maybe it did; maybe it didn't, true?

A. True.

Q. So I get back to my original question, Doctor, you cannot state an opinion with reasonable medical probability that the care and treatment rendered to the patient at Staten Island University Hospital in

fact did shorten the patient's life expectancy, true?

A. I would have to come back to my answer. I would say the lack of care that was given—

Q. May have?

A. —may have shortened her life. We know that steroids increase life. So by not giving steroids, it is impossible for me to say, but one would assume that it shortens the life.

. . . .

Q. Getting back to this particular patient who did not just have metastasis of the brain, but also to the kidney, scalp and neck, it is certainly possible that even if she had gotten steroids, it would not have significantly to any significant degree changed her life expectancy, true?

A. Again, I'd have to say I would assume that by giving steroids it may have increased her life. It may have reduced her suffering.

*See* Block Decl., Ex. 22 at 81:12–83:8. Dr. Harrison testified in his deposition that he could not give any opinion as to whether steroids would have lengthened her life expectancy, *id.,* Ex. 23 at 178:19–24, but did testify that treating patients with brain metastasis with steroids generally reduces pain and suffering:

Q. Similarly because you don't have any information about what, if any, pain and suffering she had or what pain control medicine she was on, you can't state that her not receiving steroids in this case in fact increased her pain and suffering or loss of enjoyment of life beyond that of her underlying disease, true?

A. No, that's not true because, you know, when you treat patients with brain metastasis and you give them steroids, it's usually pretty quick.

They feel better usually very, very quickly. It's one of the more dramatic things in medicine, is when you gave patients with brain edema steroids and, you know, they can—they can feel better and feel more comfortable in a relatively short order, which is why it's done so routinely, so I can't comment about what this particular patient would have experienced, but that's the ... generalized experience, and that's why steroids are used, you know, routinely because patients feel better. Their brain swelling gets less and, you know, their symptoms usually improve.

*Id.*, Ex. 23 at 178:25–179:22.

### 4. Participation of the Hospital Defendants

Both Dr. Gliedman and Dr. Harrison testified that they could not give an opinion with reasonable medical certainty as to whether Healthcare, Inc. or System, Inc. negligently treated any of the 20 deceased plaintiffs. *See* Block Decl., Ex. 22 at 69:24–70:13, Ex. 23 at 60:5–62:9. They also could not state with reasonable medical certainty whether any of the 14 named directors, officers, and employees of the hospital corporations departed from accepted medical practices or caused injury to any plaintiff. *See id.*, Ex. 22 at 68:6–18, Ex. 23 at 62:10–63:19.

### 5. Lack of informed consent

The plaintiffs' expert report refers to "informed consent" in the cases of eight of the deceased plaintiffs, and it does so only briefly:

a) DiGanci—"It is not documented in this chart that the patient understood the unusual and unorthodox nature of this treatment program, as part of the informed consent process. The consent form was not dated by the interpreter, thus not allowing us to verify that informed consent was obtained in a timely manner."

b) Cattai—"We have concerns about the informed consent given to this patient. The consent, although signed, was not dated by an interpreter. Thus, we do not know whether the interpreter was present at the time of the discussion. Thus, we cannot verify that this patient received informed consent in a timely manner."

c) Caramanna—"The potential harm of delivering radiation therapy to a patient without cancer, and with pancreatitis, was not completely explained, suggesting that true informed consent may not have been obtained."

d) Roda—"The consent form was not dated by the patient, interpreter, or witness so we cannot verify that informed consent was provided in a timely manner."

e) Cervone—"[C]onsent form was neither [sic] dated by the patient, witness, or interpreter. Thus we cannot verify that informed consent was given in a timely manner."

f) Caberti—"The consent form is not dated by the patient, interpreter or witness. Thus, we cannot verify that the informed consent was obtained in a timely manner."

g) Landoni—"We feel that this approach was experimental, and was inappropriately used outside of an experimental protocol and the informed consent process inherent to patient participation in a clinical trial."

h) Baccichetto—"We do note that the consent form was incomplete and that there was no interpreter. Therefore we cannot confirm that the informed consent was truly obtained."

*See* Behrins Decl., Ex. Y. Neither Dr. Gliedman's nor Dr. Harrison's deposition included testimony that discussed whether the deceased plaintiffs underwent treatment without first giving their informed consent, and the plaintiffs proffered no other evidence on the issue.

### 6. Defendants' medical experts

In support of their motion, the Hospital Defendants proffered the affidavits of three medical experts who gave their opinions as to whether the treatment that the plaintiffs' received deviated from the standard of care and whether the treatment caused death or injury. None of whom offered any opinion as to whether the deceased plaintiffs gave their informed consent.

Mark A. Fialk, M.D., reviewed the treatment of Scurto, Caberti, Ettore, Brovelli, Roda, and Cervone, and concluded that, in his opinion with "a reasonable degree of medical certainty," the treatment that these deceased plaintiffs received did not shorten their lives or cause them harm or pain. Block Decl., Ex. 42 ¶¶ 4, 9, 12, 13, 15, 19, 20, 24. Michael L. Grossbard, M.D., reviewed the treatment of Bacchichetto, Caramanna, Cataranelli, Cattai, Centore, D'Ambrosio, DiGanci, Facchini, Lucchi, Landoni, and Spirito. Dr. Grossbard stated "[i]t is my opinion with a reasonable degree of medical certainty that in ten of the eleven cases, I can find no evidence from the available records that fractionated stereotactic body radiosurgery was either an inappropriate therapy to consider for palliative treatment or that it led to an inferior survival outcome or increased symptoms for the treated patients." Block Decl., Ex. 43 ¶ 41. In the case of Caramanna, however, he stated "I am concerned that radiation therapy was administered without the pathological diagnosis of metastatic cancer and that radiation therapy *may* have been inappropriately administered to a patient with chronic pancreati-

tis." *Id.* ¶ 42 (emphasis in the original). Because the medical record that he examined did not indicate whether Caramanna's diagnosis prior to treatment was either pancreatic cancer or chronic pancreatitis, he could only state that "it is possible that the administration of radiation therapy to this patient may have contributed to her poor outcome." *Id.* ¶ 12. Marleen I. Meyers, M.D., reviewed the treatment of Deodato, Busti, and Pesci. In her opinion "with a reasonable degree of medical certainty," there was no evidence that the treatment these three patients received either shortened their lives or worsened their symptoms. Block Decl., Ex. 44 ¶¶ 6, 8, 11.

Defendant Lederman also proffered an expert report that reaches generally the same conclusions as the Hospital Defendants' three experts. *See* Declaration in Support of Lederman, dated Sept. 5, 2008, Ex. D. This report, however, is unsworn, and therefore it cannot be considered as a part of the record. *See infra* (discussion of admissibility of unsworn expert reports).

### DISCUSSION

### A. Preliminary issues

Before considering the defendants' motions for summary judgment on their merits, the Court must address, first, whether the parties' violation of Local Rule 56.1 precludes the Court from considering the present motions and, second, whether the statement of Salvatore Conte and the plaintiffs' expert report are admissible.

#### i. Noncompliance with Local Rule 56.1

 Local Rule 56.1 states, with emphasis in the original:

(a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, *in numbered paragraphs,* of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

(b) The papers opposing a motion for summary judgment shall include *a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing* a separate, short and concise statement of *additional* material facts as to which it is contended that there exists a genuine issue to be tried.

(c) *Each numbered paragraph in the statement of* material facts set forth in the statement required to be served by the moving party will be deemed to be admitted *for purposes of the motion* unless *specifically* controverted by a *correspondingly numbered paragraph* in the statement required to be served by the opposing party.

(d) Each statement *by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact,* must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

"The purpose of a Local Rule 56.1 statement is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 74 (2d Cir.2001). Here, both the movants and the non-movants have failed to submit statements that concisely identify the facts that are material to this litigation, thereby violating the Local Rule's clear and unmistakable provi-

sions. The Court, however, "has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and "may in its discretion opt to 'conduct an assiduous review of the record'" on its own. *Id.* (quoting *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000)). In this instance, the Court has determined that a thorough review of the record was appropriate notwithstanding the thousands of pages of documents submitted by the parties.

### ii. Admissibility of the plaintiffs' submissions

The defendants argue that the Court should exclude the statement of Salvatore Conte and the plaintiffs' medical expert report from the record at summary judgment. *See* Reply Memorandum of Law ("Block Reply Mem."), dated Oct. 20, 2008, at 8. These objections will be considered in turn.

First, Salvatore Conte's statement, discussed *supra,* broadly outlines his coordination with various defendants in the effort to promote in Italy the FSR treatment available at SIUH. *See* Behrins Decl., Ex. B. The proffered exhibit itself includes the original statement, which is written in Italian, and what ostensibly is a word-for-word English translation provided by the plaintiffs for the benefit of all the parties and the Court. The defendants argue that the statement is not admissible at summary judgment because it does not constitute an unsworn declaration as defined by 28 U.S.C. § 1746. Block Reply Mem. at 8. Implicit in this objection is the defendants' contention that the statement is unsworn. While it is not obvious from the face of the original document whether the statement is sworn, the defendants are nonetheless correct that

the statement is inadmissible pursuant to § 1746.[7]

▋ Whether it is admissible at all, however, is purely an academic question for the purposes of this motion. Nothing in the statement creates a factual dispute that would necessitate the denial of summary judgment in the defendants' favor. Thus, in the interest of drawing inferences in favor of the non-movant, the Court will assume the statement is admissible.

▋ Second, the Hospital Defendants contend that the plaintiffs' medical expert report "is unsworn and thus does not satisfy the admissibility requirement of Rule 56(e)." Block Reply Mem. at 8. The defendants cite *Berk v. St. Vincent's Hosp. and Med. Center*, 380 F.Supp.2d 334, 352 (S.D.N.Y.2005), for the proposition that "[c]ourts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support."

The Second Circuit in *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir.2005), agreed with that conclusion, stating that "[a]s a general matter, it is correct that unsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment." (Citing Rule 56(e) and *Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 391–92 (S.D.N.Y. 1998)). Nevertheless, the Second Circuit held that the district court abused its discretion when it excluded two unsworn medical expert letters proffered by the plaintiff in opposition to the defendants' motion for summary judgment. The letters, the court explained, should not have been excluded because, first, the defendants had waived any objections to them by offering them as exhibits in support of their motion for summary judgment and by citing and relying on them in their

---

**7.** While district courts should disregard any unsworn letter in ruling on a summary judgment motion, *see LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65 (2d Cir.1999), 28 U.S.C. § 1746 permits the consideration of certain unsworn statements at summary judgment:

> Wherever, under any law of the United States or under any rule ... any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit ... such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the form:
> (1) If executed without the United States: "I declare ... under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).
> (Signature)".

28 U.S.C. § 1746. In *LeBoeuf*, the Second Circuit emphasized that an unsworn statement would be treated as a sworn declaration if it *substantially* followed the form prescribed by § 1746. 185 F.3d at 65. While it is unclear exactly what is meant by "substantially," *compare id.* (holding that the letter at issue substantially complied with § 1746 even though it stated only "[u]nder penalty of perjury, I make the statements contained herein") with *Sterling Fifth Assocs. v. Carpentile Corp.*, No. 03 Civ. 6569(HB), 2003 WL 22227960, at *5 (S.D.N.Y. Sept. 26, 2003) (holding that "Yousef S. Al Majid, pursuant to 28 U.S.C. 1746 and under penalty of perjury declares and says ..." was not substantially the form prescribed in § 1746), it is plain that Conte's unsworn statement, which begins "Salvatore Conte swears and declares the following ...", falls short of the form prescribed in § 1746. There is no statement that Conte is subject to perjury for any falsities, no reference to United States law, and no language that conveys that the statement is "true and correct." It simply states that Conte "swears" and is therefore insufficient under § 1746.

moving papers. *Id.* Second, the plaintiff was prejudiced by their exclusion because the letters had apparently become a part of the summary judgment record when included with the defendants' motion, and without notice of any issue as to their admissibility, the plaintiff was reasonable in his belief that he could rely on them. Since *Capobianco,* at least one district court has held that "even a *reference* to the unsworn or unaffirmed reports in the moving papers is sufficient to permit the plaintiff to rely upon and submit these reports in opposition to the motion." *Waldman v. Atlantic–Heydt,* No. 04 Civ. 2145(SJ), 2006 WL 2010783, at *6 (E.D.N.Y. July 14, 2006) (emphasis in the original) (quoting *Kearse v. New York City Transit Auth.,* 16 A.D.3d 45, 47 n. 1, 789 N.Y.S.2d 281 (N.Y.App.Div.2005)).

Here, the Hospital Defendants included the plaintiffs' unsworn expert report in their motion papers, *see* Block Decl., Ex. 15, and referred to it frequently in their Memorandum of Law, *see* Memorandum of Law in Support of the Summary Judgment Motion ("Block Mem."), dated Sept. 8, 2008, at 6, 8, 9, 15, before objecting to its admissibility in their Reply Memorandum. That objection had been effectively waived. Moreover, both of the plaintiffs' medical experts were deposed by the defendants, and during the course of the testimony, frequent reference was made to the report and the medical opinions therein. Therefore, the plaintiffs' medical expert report will not be excluded from the summary judgment record.

The Court will now consider the merit of the defendants' motions for summary judgment.

### B. Standard of review

"The plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the burden to demonstrate that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the moving party has shown that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e)(2), and "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998); *see also Bickerstaff v. Vassar College,* 196 F.3d 435, 452 (2d Cir.1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment"). The Court is compelled to draw all reasonable inferences in favor of the non-moving party. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. A genuine issue exists if a reasonable jury could find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### C. Violation of New York General Business Law §§ 349 and 350

 "Section 349(a) of the General Business Law declares as unlawful 'deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state.'" *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 24, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995) (quoting N.Y. Gen. Bus. Law § 349). A prima facie case requires proof

that the defendants engaged in an act or practice that was deceptive or misleading in a material way and that the plaintiffs were injured by reason thereof. *Id.* at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (citing *Varela v. Investors Ins. Holding Corp.*, 81 N.Y.2d 958, 961, 598 N.Y.S.2d 761, 615 N.E.2d 218 (1993)). Deceptive acts or practices are defined as "those likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741. General Business Law § 350 provides that "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the state is hereby declared unlawful," and while applying specifically to false advertising, the standard of recovery is identical to that of § 349. *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002) (quoting § 350). Both statutes were intended to apply "to virtually all economic activity," including the provision of medical services, in an effort to secure "an honest market place where trust, and not deception, prevails." *Id.* at 323–24, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (internal citations and quotation marks omitted); *see Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 290–92, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999) (both § 349 and § 350 apply to virtually all economic activity and blanket exemptions for providers of medical services and products is contrary to the plain language of the statute and its legislative history).

▮ The plaintiffs in their Memorandum in Opposition repeat their allegations of deceptive acts and false advertising, including that "the defendants, in their brochures, videos, advertisements, seminars, and internet sites promised a success rate, depending on the type of cancer, of between 88 and 94% in the stopping of growth of, shrinking or totally eliminating the disease even in 'hopeless cases,'" and they assert that their allegations will be

proven at trial. Plaintiffs' Memorandum in Opposition ("Pl. Mem."), dated Oct. 10, 2008, at 4. The defendants in their Reply Memorandum argue that the plaintiffs "misconstrued the stage of this action" in that they "argue that they have asserted sufficient allegations of injury to establish a *prima facie* case," but instead "plaintiffs must present supporting admissible evidence as proof that the defendants' deceptive practices caused injury." Block Reply Mem. at 14–15. The defendants' motion for summary judgment does not require the Court to consider the legal merits of the allegations but whether the evidentiary record presents questions of fact that necessitate a trial. The Court finds there to be no evidence to support the allegations that the defendants engaged in deceptive acts or practices in their promotion of the FSR program.

In his statement, Salvatore Conte asserts that Lederman and other defendants promoted the FSR program's success rates through television advertisements, internet websites, news articles, and conferences. However, the plaintiffs fail to proffer any evidence, let alone medical expert testimony, to prove that the success rates or any other data used in the promotion of the FSR program were false, misleading, or otherwise deceptive. *See Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 346–48, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999) (the plaintiff survived the motion for summary judgment of its § 349 claim because the "sworn assertions" he presented evidencing that the insurance company was skewing its dividend rate figures to promote its insurance policies were "sufficient to raise a question of fact"); *Myers, Smith & Granady Inc. v. N.Y. Prop. Ins. Underwriting Ass'n*, 85 N.Y.2d 832, 833–34, 623 N.Y.S.2d 840, 647 N.E.2d 1348 (1995) (summary judgment was granted dismissing the plaintiffs allegations because the plaintiff provided no

proof that the defendant's actions were deceptive or fraudulent). The brochures promoting FSR treatment that the plaintiffs attached as exhibits to their opposition papers, *see* Behrins Decl., Ex. O, assuming their authenticity, are evidence of *what* representations the defendants made but not *whether* those representations were fraudulent or misleading. Without evidence to substantiate the plaintiffs' allegations of deception and false advertising, they must be dismissed as purely conclusory.

 Moreover, §§ 349 and 350 only prohibit consumer deception or false advertising that occurs in New York state. *Goshen*, 98 N.Y.2d at 325, 746 N.Y.S.2d 858, 774 N.E.2d 1190. "To apply the statute to out-of-state transactions ... would lead to an unwarranted expansive reading of the statute, contrary to legislative intent, and potentially leading to the nationwide, if not global application of General Business law § 349." *Id.* Plainly, "it was not intended to police the out-of-state transactions of New York companies." *Id.* The plaintiff in *Goshen* alleged that the defendant, a New York based insurance company, engaged in deceptive conduct in New York when it created a deceptive promotional campaign. The plaintiff was in Florida when he received the defendant's promotional materials, purchased the deceptively promoted insurance policy, and paid his premiums. The Court of Appeals held:

> [t]he reference in section 349(a) to deceptive practices in "the conduct of any business, trade or commerce or in the furnishing of any service in this state" ... unambiguously evinces a legislative intent to address commercial misconduct occurring within New York. Indeed an examination of the text of the General Business Law § 349 leads us to conclude that "in this state" can only modify "the conduct of any business, trade or com-

merce [or] the furnishing of any service." The phrase "deceptive acts or practices" under the statute is not the mere invention of a scheme or marketing strategy, but the actual misrepresentation or omission to a consumer. Thus to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York.

*Goshen*, 98 N.Y.2d at 324–25, 746 N.Y.S.2d 858, 774 N.E.2d 1190.

Here, the deception that the plaintiffs have alleged occurred in Italy and therefore, even if proved, would be beyond the reach of New York's consumer fraud statute. The plaintiffs have not proffered evidence to suggest that the defendants engaged in promotional activities or advertising that deceived a consumer in New York and resulted in that consumer's injury. The defendants' motion for summary judgment of the claims pursuant to §§ 349 and 350 is therefore granted.

## D. Medical malpractice

 To succeed in their claim for medical malpractice, the plaintiffs must proffer evidence showing that (1) the defendant (2) deviated from the applicable standard of accepted medical practice and (3) that the alleged deviation proximately caused (4) the patient's injury. *See Koeppel v. Park*, 228 A.D.2d 288, 289, 644 N.Y.S.2d 210 (N.Y.App.Div.1996); *see also Berger v. Becker*, 272 A.D.2d 565, 565, 709 N.Y.S.2d 418 (N.Y.App.Div.2000) ("a plaintiff must prove (1) the standard of care in the locality where the treatment occurred, (2) that the defendant breached that standard of care, and (3) that the breach of the standard was the proximate cause of injury"). As a preliminary matter, it is clear that the medical malpractice claims against many of the defendants are meritless. Neither of the plaintiffs' experts could

state that Healthcare, Inc. or System, Inc. caused any injury to any of the deceased plaintiffs, *see* Block Decl., Ex. 22 at 69–24–70:13, Ex. 23 at 60:5–62:9, nor could they state that any of the 14 directors, officers, or employees of the corporate defendants caused or contributed to any injury. *Id.*, Ex. 22 at 68:6–18, Ex. 23 at 62:10–63:19. Moreover, the plaintiffs' experts could not state that SIUH caused any injury to any of the deceased plaintiffs. *See generally id.*, Ex. 22 and 23. Summary judgment of the medical malpractice claims as to those defendants is granted.

 As to the claims against the defendant physicians, the plaintiffs must establish both a deviation from accepted standards of medical care and proximate cause by proffering expert medical opinion evidence which is required in cases such as this where the matters are not within the ordinary experience and knowledge of laypersons. *See Mosberg v. Elahi*, 80 N.Y.2d 941, 942, 590 N.Y.S.2d 866, 605 N.E.2d 353 (1992); *Nichols v. Stamer*, 49 A.D.3d 832, 833, 854 N.Y.S.2d 220 (N.Y.App.Div.2008); *Orr v. Meisel*, 248 A.D.2d 451, 451, 669 N.Y.S.2d 664 (N.Y.App.Div.1998). When giving his medical opinion, a medical expert must convey the certainty of that opinion to assure the Court that the opinion is not based on mere supposition or speculation. *See Matott v. Ward*, 48 N.Y.2d 455, 463, 423 N.Y.S.2d 645, 399 N.E.2d 532 (1979). While that burden is most frequently satisfied by the phrase "reasonable degree of medical certainty" or something roughly equivalent, "any formulation from which it can be said that the witness' 'whole opinion' reflects an acceptable level of certainty" is sufficient. *Id.* at 460, 423 N.Y.S.2d 645, 399 N.E.2d 532. This by no means suggests that medical opinions require absolute certainty in order to constitute evidence. Rather, proffered expert testimony must make it "reasonably apparent" that the testifying doctor "intends to signi-

fy a probability supported by a rational basis." *Id.* at 461, 423 N.Y.S.2d 645, 399 N.E.2d 532 (quoting *Matter of Miller v. National Cabinet Co.*, 8 N.Y.2d 277, 282, 204 N.Y.S.2d 129, 168 N.E.2d 811 (1960)). An opinion that conveys less does not constitute evidence and therefore cannot create a factual dispute.

 Here, the defendants argue that "[b]oth [the plaintiffs'] experts' report and testimony are completely devoid of any opinion establishing the requisite elements of a malpractice action for all of the twenty (20) patients." Block Mem. at 5. Notably, the plaintiffs do not controvert this argument in their opposition papers. *See* Behrins Decl., ¶ 16 (arguing only that "there were, indeed, many departures and deviations" but making no argument as to proximate cause). The defendants are largely correct. There is no expert opinion evidence to suggest that the treatment received by Cataranelli, Cervone, Brovelli, Baccichetto, DiGanci, Deodato, Ettore, or Pesci deviated from the standard of care. The plaintiffs' experts could also not state an opinion with a reasonable degree of medical certainty as to whether Busti, D'Ambrosio, Facchini, Landoni, Roda, or Scurto were proximately injured by any treatment they received. Because insufficient evidence has been proffered to sustain the medical malpractice claims of these 14 plaintiffs, summary judgment of those claims is granted.

 As to plaintiffs Cattai, Centore, Lucchi, and Spirito, the plaintiffs' experts stated in their report that the treatment these plaintiffs received deviated from the standard of care, but their deposition testimony falls short of creating a question of fact regarding whether the deviations proximately caused injury. As to plaintiff Cattai, who suffered from gastrointestinal bleeding weeks after receiving FSR treatment at SIUH, the plaintiffs' experts could not state with a reasonable

degree of medical certainty that the FSR treatment shortened his life, nor could they discern whether the FSR treatment was the cause of bleeding. *See* Behrins Decl., Ex. Y at 4; Block Decl., Ex. 22 at 123:15–22, 127:16–20, Ex. 23 at 87:14–21, 91:4–12, 95:11–15. In the cases of Centore, Lucchi, and Spirito, Dr. Harrison could not give an opinion as to proximate cause, Block Decl., Ex. 23 at 100:7–18, 106:5–107:18 (as to Centore); at 132:11–133:4 (as to Lucchi); at .153:2–15 (as to Spirito), and Dr. Gliedman testified that the only injury that these three patients suffered was that their time was wasted.[8] *See id.*, Ex. 22 at 140:5–141:9 (as to Centore), 152:21–24 (as to Lucchi), 170:8–171:6 (as to Spirito). One cannot reasonably infer proximate cause from this testimony; therefore, summary judgment of the medical malpractice claims of these patients is warranted.

■ The defendants' motion for summary judgment is denied, however, as to the malpractice claims of plaintiffs Caramanna and Caberti. The Court finds there to be sufficient expert opinion evidence that the treatment they received deviated from the standard of care and that those deviations proximately caused them injury. The plaintiffs' expert report stated that the FSR treatment Caramanna received did not meet the relevant standard of care and that it "may have contributed to [her] death ... ," *see* Behrins Decl., Ex. Y at 5, and that opinion was shared by defendants' expert Dr. Grossbard who stated that "the administration of radiation therapy to this patient may have contributed to her poor outcome." Block Decl., Ex. 43 ¶ 12. The lack of certainty as to proximate causation does not render these opinions inadmissible. The New York Court of Appeals in *Matott* instructed that expert testimony asserting that negligent medical treatment "could have" or "might have" caused an injury is still admissible evidence. *See* 48 N.Y.2d at 461, 423 N.Y.S.2d 645, 399 N.E.2d 532 (citing *Turner v. City of Newburgh*, 109 N.Y. 301, 16 N.E. 344 (1888)).[9] In Caberti's case, the Court finds that both the plaintiffs' expert report and Dr. Harrison's testimony provide evidence that failure to treat Caberti with steroids was a deviation from acceptable medical practices that proximately caused her more pain and suffering.[10] The plaintiffs'

8. In a claim for medical malpractice, this is a plainly incognizable injury. Nonpecuniary injuries include pain, suffering, and injuries that affect a plaintiff's capacity to lead a normal life. *See McDougald v. Garber*, 73 N.Y.2d 246, 255, 538 N.Y.S.2d 937, 536 N.E.2d 372 (1989). "Loss of enjoyment of life" entails mental anguish that stems from the inability to engage in certain activities, or in other words, the inability to live life to its fullest. *See id.* at 255–56, 538 N.Y.S.2d 937, 536 N.E.2d 372. Unnecessary medical treatment that does no more than waste the patient's time cannot be said to have caused an injury.

9. As the New York Court of Appeals in *Matott* explains:

allowing for the fact that the cause and effect relationship was one that, perhaps by its very nature, could not be established with scientific certainty, the reservations the doctor articulated by his other comments and responses can be seen as candid indications of the limitations inherent in medical opinion and, as such, a useful revelation to the jury in reaching its own conclusions as to the merits of the parties' opposing contentions on causation....
48 N.Y.2d at 462, 423 N.Y.S.2d 645, 399 N.E.2d 532.

10. The Court finds that Dr. Gliedman's testimony regarding Caberti is too speculative to constitute expert opinion evidence of proximate cause. The relevant portion of his deposition reads:

Q. So I get back to my original question, Doctor, you cannot state an opinion with reasonable medical probability that the care and treatment rendered to the patient at Staten Island University Hospital in fact did shorten the patient's life expectancy, true?

expert report stated that "the patient should have received steroids as soon as it was known that there was a mass in the brain. This would have given some relief of her symptoms." Behrins Decl., Ex. Y at 8. Dr. Harrison testified that, while he could not state with reasonable medical probability that treating Caberti with steroids would have lengthened her life expectancy, see id. Ex. 23 at 178:19–24, it was his opinion that patients with brain metastasis generally experienced less pain and suffering when treated with steroids. Although he was not able to testify with confidence as to what Caberti would have experienced herself, id. at 179:9–25, he made it reasonably apparent that the failure to treat Caberti with steroids likely amplified the pain and suffering that she experienced.[11]

 Caberti and Caramanna must also proffer evidence to establish that a specific defendant committed the alleged malpractice. *See Hughes v. N.Y. Hosp.-Cornell Med. Center*, 195 A.D.2d 442, 443–44, 600 N.Y.S.2d 145 (N.Y.App.Div.1993) ("in order to establish a prima facie case in a medical malpractice action . . . a plaintiff

need do no more than offer sufficient evidence from which a reasonable person might conclude that it was more probable than not that the injury was caused *by the defendant*" (emphasis added) (internal quotation marks omitted)).[12] The Court finds that the evidence suggests that only Lederman and Silverman treated these plaintiffs for cancer. Dr. Gliedman and Dr. Harrison in their depositions and Dr. Fialk in his affidavit suggest that Lederman and Silverman had treated Caberti, see Block Decl., Ex. 22 at 185:4–5 and Ex. 23 at 167:8–11, 172:13–15; Ex. 42 ¶ 6, and numerous notes and memoranda authored by Lederman and Silverman are included in Caberti's hospital record. *See id.*, Ex. 64. Although none of the experts testified as to who treated Caramanna, her hospital records also suggest that both Lederman and Silverman treated her. *See id.*, Ex. 53. In the case of defendant Grosman, she denied by affidavit that she ever treated Caramanna, see Declaration in Support by Anthony A. Lenza ("Lenza Decl."), dated Sept. 8, 2008, Ex. B, and there is no other evidence to suggest that she did. There is also no evidence to suggest that she treated Caberti for cancer. The only evidence

---

A. I would have to come back to my answer. I would say the lack of care that was given—

Q. May have?

A. —may have shortened her life. We know that steroids increase life. So by not giving steroids, *it is impossible for me to say, but one would assume that it shortens the life.*

*Id.*, Ex. 22 at 81:21–82:11 (emphasis added). The Court cannot read that testimony and find that "it is reasonably apparent that the doctor intends to signify a probability supported by some rational basis." *Matott*, 48 N.Y.2d at 461, 423 N.Y.S.2d 645, 399 N.E.2d 532.

11. The Court reaches this conclusion notwithstanding the fact that the record is thin on evidence suggesting that Caberti did in fact experience pain and suffering. As the Court stated *supra*, it is not clear from the record

what the symptoms were that would have been relieved if Caberti received steroids. The plaintiffs' experts do not identify in their testimony what pain or suffering the steroids would have alleviated. Nevertheless, one may reasonably infer from the evidence establishing that Caberti had terminal cancer, with at least one of her tumors impacting her brain stem, that she also experienced pain and suffering.

12. The plaintiffs in this suit were indiscriminate in their claims of medical malpractice, alleging that all of the defendants, including the officers and directors of the hospital, were liable. The plaintiffs do not suggest in their brief or accompanying affidavits who actually treated each of them, and the plaintiffs' expert report is similarly silent. Without such guidance, the Court was required to search the voluminous record for evidence.

that she treated Caberti at all is a note bearing her signature found in Caberti's hospital record pertaining to Caberti's admission into the emergency room to receive treatment for shingles. *See* Block Decl., Ex. 64, at GCab10.

Without evidence to demonstrate that Grosman negligently failed to treat Caberti with steroids or that she negligently treated Caramanna, summary judgment of these two plaintiffs' medical malpractice claims is granted in her favor. As to Lederman and Silverman, one could reasonably infer from the expert testimony as well as Caberti's and Caramanna's hospital records that they were responsible for the alleged malpractice. Therefore, the defendants' motion for summary judgment is denied as to Caberti's and Caramanna's medical malpractice claims against Lederman and Silverman.

### E. Hospital and Medical Negligence

█ The plaintiffs have alleged that SIUH, Healthcare, Inc., and System, Inc. have "failed, neglected, and/or intentionally refused to use reasonable care in the employment, training, supervision, and the retention of those defendants engaged in the marketing, selling, and administering of Fractionated Stereotactic Radiosurgery. ...." Block Decl., Ex. 1 ¶ 180, Ex. 3 ¶ 160. The plaintiffs have proffered no evidence to support these allegations, nor do they dispute the defendants' contention that they be dismissed as "conclusory and baseless." Block Mem. at 22. The defendants' motion for summary judgment of this claim is granted.

### F. Lack of informed consent in violation of Public Health Law § 2805–d

█ "Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical ... practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation." N.Y. Pub. Health Law § 2805–d(1)(McKinney 2008); *see also Lipsius v. White,* 91 A.D.2d 271, 280, 458 N.Y.S.2d 928 (N.Y.App.Div.1983) ("It is the physician's obligation to furnish a reasonable explanation of the available choices and potential dangers, the test of such reasonableness being for the jury to determine"). The plaintiff must prove that "a reasonably prudent person in the patient's position would not have undergone the treatment or diagnosis if he had been fully informed and that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought." § 2805–d(3). Under New York law, "a patient making this claim must adduce medical expert testimony in support of the alleged qualitative insufficiency of the consent." *Kourkounakis v. Russo,* 167 Fed.Appx. 255, 257 (2d Cir.2006) (citing N.Y. Civ. Prac. L. & R. § 4401–a (McKinney 2005)).

█ The defendants argue that the plaintiffs have failed to present any expert medical testimony addressing the qualitative insufficiencies of the patients' consent. Block Mem. at 26–27. The plaintiffs respond that "[t]he English to Italian to English language barrier, *per se,* gives rise to some serious factual issues, and when it's considered in conjunction with the countless other deficiencies permeating the consent forms, it gives rise to a plethora of genuine issues of material facts." Pl. Mem. at 25. The plaintiffs also direct the Court's attention to exhibits 45 through 64 of the Block Declaration, which together constitute approximately 2,800 pages of hospital records, for evidence of other consent forms that were not signed or dated. *See* Behrins Decl., ¶ 17 at 23–24.

The plaintiffs do not cite to any case law to support their assertion that a language barrier alone *per se* creates a factual dispute as to informed consent, nor have the plaintiffs proffered evidence to support a finding that any translation was either insufficient or, in the cases of some of the plaintiffs, even necessary. The "countless other deficiencies" of which the plaintiffs speak were delineated in their expert report which states that the interpreter, the witness, the patient, or some combination of the three failed to date the consent form in the cases of DiGanci, Cattai, Roda, Cervone, and Caberti. *See* Behrins Decl., Ex. Y. Notwithstanding the deficiencies in the consent forms, nothing that the plaintiffs have proffered suggests that the foreseeable risks or alternatives to treatment were not reasonably explained to each of the plaintiffs or that they did not give their consent to receive that treatment. There is also no evidence to suggest that a reasonably prudent person in each deceased plaintiff's position would not have undergone the same treatment. Because the evidence supporting their allegations woefully inadequate, the defendants' motion for summary judgment of the Public Health Law § 2805–d claim is granted.

### G. Wrongful death

■ New York Estates, Powers, and Trusts Law § 5–4.1 states, in pertinent part, that the personal representative of a deceased plaintiff "may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued." The defendants have moved for summary judgment of the plaintiffs' wrongful death claims. Because there is a question of fact as to whether Caramanna's death was caused by the malpractice of Lederman and Silverman, summary judgment of Caramanna's wrongful death claim against those defendants is denied. There is no evidence to substantiate any other wrongful death claim at bar. Therefore, the defendants' motion for summary judgment of those claims is granted.

### H. Loss of consortium

■ A loss of consortium claim "represents an injury to the marital relationship." *Buckley v. National Freight, Inc.*, 90 N.Y.2d 210, 215, 659 N.Y.S.2d 841, 681 N.E.2d 1287 (1997); *see also Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 502, 293 N.Y.S.2d 305, 239 N.E.2d 897 (1968) ("The concept of consortium includes not only loss of support or services, it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more."). Because a spouse's loss of consortium claim is derivative of a decedent's cause of action, it must fail when the primary claim fails. *See Maddox v. City of New York*, 108 A.D.2d 42, 49, 487 N.Y.S.2d 354 (N.Y.App. Div.1985), *aff'd*, 66 N.Y.2d 270, 496 N.Y.S.2d 726, 487 N.E.2d 553 (1985). To the extent that the decedents' claims are dismissed, summary judgment is also granted as to the claims of their spouses. As to Caberti and Caramanna, although there is no evidence that their spouses lost companionship or society due to the injuries allegedly sustained, that loss "can be reasonably inferred from the state of marriage itself." *Rangolan v. County of Nassau*, 370 F.3d 239, 248 (2d Cir.2004). Therefore, summary judgment is denied to the claims of Giuseppe Bono (the surviving spouse of Caramanna) and of Francesco Amato (the surviving spouse of Caberti).

### I. Taxation of Costs

■ The defendants request that the Court order the taxation of costs to the extent it has dismissed the plaintiffs' claims. Rule 54(d), Fed.R.Civ.P., states:

(1) Costs Other Than Attorney's Fees. Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party. But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law. The clerk may tax costs on 1 day's notice. On motion served within the next 5 days, the court may review the clerk's action.

The term "costs" includes only specific items such as (1) fees of the clerk and marshal, (2) fees for printed or electronically recorded transcripts necessarily obtained for use in the case, (3) fees and disbursements for printing and witnesses, (4) fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case. *Whitfield v. Scully,* 241 F.3d 264, 269–70 (2d Cir.2001) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 441, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987)); 28 U.S.C. § 1960 (2009). This includes deposition expenses when the deposition is taken for use in the case. *Whitfield,* 241 F.3d at 270.

 The prevailing party may be denied costs because of its own misconduct, the public importance of the case, the difficulty of the issues, or the losing party's limited financial resources. *Id.* Given the nature of these claims and the difficulty of litigating them considering, *inter alia,* language barriers and geographic distance, the Court is inclined to deny costs.

### CONCLUSION

The Court need not consider the defendants' remaining arguments that certain claims are barred by the statute of limitations and that the Court lacked personal jurisdiction over four of the individual defendants due to insufficient service of process, for the Court has granted summary judgment as to those claims that are barred and has dismissed the claims against those defendants who allegedly were not served.

Because the paucity of evidence proffered in support of most of the plaintiffs' allegations did not establish essential elements of their claims, the defendants' motion is GRANTED to the extent described above, and those claims are dismissed. The defendants' motion is DENIED as to the medical malpractice and wrongful death claims of plaintiff Caramanna against defendants Lederman and Silverman, as to the medical malpractice claim of plaintiff Caberti against Lederman and Silverman, and as to the loss of consortium claims of their spouses against Lederman and Silverman.

SO ORDERED.